**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MAURICE STOKES,       *

Plaintiff       *

v.       *       Civil Action No. JKB-16-3239

N. DAVIS, C/O, *et al.*,       *

Defendants       *
               ***

## MEMORANDUM OPINION

Plaintiff Maurice Stokes filed this civil rights Complaint against various correctional officers at Roxbury Correctional Institution ("RCI").  ECF No. 1.  The Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  ECF No. 11.  Plaintiff has filed a Response to the Defendants' Motion, and Defendants have filed a Reply.  ECF Nos. 17, 19.  Also pending is Plaintiff's Motion to Appoint Counsel.  ECF No. 16.  Upon review of the papers filed, the Court finds a hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, the Court will grant Defendants' Motion as to Defendants Warden Miller and Lt. Appel, deny the Motion as to the remaining Defendants, and grant Plaintiff's Motion to Appoint Counsel.

## I. BACKGROUND

### A. Factual Background

Plaintiff was a Pennsylvania inmate who was transferred to Maryland "due to a $50,000 bounty out on [Plaintiff's] life."  ECF No. 1 at 4.  Plaintiff stated that, following his transfer to RCI in October 2014, he "informed Intel as well as Central Office of the severity of [his] situation and the many attempts on [his] life as well as [his] family, asking that they protect [his]

file as well as [his] identity." *Id.* According to Plaintiff, he was not protected and unspecified correctional officers told other inmates information about Plaintiff "which led to [Plaintiff] being extorted, assaulted and harassed." *Id.* at 5. Plaintiff "complained to the Warden, Chief of Security and Central Office for 8 months" concerning this mistreatment, before ultimately writing "an inappropriate letter to staff to force [the officers] to put [Plaintiff] in the [Administrative Housing Unit] and see [him]." *Id.*

Plaintiff was placed in the Administrative Housing Unit, but the change in housing did not cure the problem. Plaintiff alleged that he "continued to write Intel" about the ongoing harassment that he faced. *Id.* He met with Defendant Appel on August 27, 2015, and "informed him about all that occurred with the [correctional officers] and inmates over the prior 9 months but withheld names for [Plaintiff's] own safety." *Id.*; *see also* ECF No. 11-10 at 1 (referencing date of meeting between Appel and Plaintiff).

In a letter to Plaintiff dated September 4, 2015, Warden Miller referenced a letter that Plaintiff sent on August 25, 2015, in which Plaintiff "stated that staff, correctional officers at RCI, [was] leaking information that could lead to [Plaintiff's] death." ECF No. 11-10 at 1. Miller's letter referenced Plaintiff's meeting with Appel and stated that, at that meeting, Plaintiff "did not provide any information to assist in determining what information concerning [Plaintiff] had been leaked or those who leaked the information. Additionally there was not [sic] information provided that would assist in determining the source of [Plaintiff's] endangerment." *Id.* Miller's letter also stated that he was "aware that [Plaintiff] was currently assigned to Administrative Segregation . . . . The security practices of Administrative Segregation are sufficiently executed to ensure your continued safety while at RCI." *Id.* at 2.

Thereafter, Plaintiff allegedly was threatened by correctional officers and inmates, but his complaints to Defendants Miller and Appel about these threats went unanswered. ECF No. 1 at 5. As stated in Plaintiff's Complaint,

> I went on Hungerstrike September 13, 2015 to force them to put a camera in front of my door and also to make someone see me.

> When I went on Hungerstrike the c/o's began to panic then on 9-15-2015 c/o Guyer came to my cell informing me I was to receive a cellmate at which time I refused for fear of who they'd put in to harm me while Im weak. At which time c/o Guyer left then came back telling me to pack up to move to the disciplinary tier.

> I packed my things and about an hour later c/o Guyer came to my cell without a cart for my things telling me to cuff up and go with him. Sensing something wrong instead I requested the Sgt.

> C/O Guyer left and 10 minutes later returned with c/o Davis, c/o Bollard, c/o Millin and Sgt. Sadler. [T]hey opened up my door and Davis told me to go to the back of my cell . . . and face the wall to be cuffed up. As I turned to face the wall c/o N. Davis punched me in the back of the head and he and company proceeded to beat me.

> Once on the ground I was stomped repeatedly then cuffed. They then stood me and threw me out of the cell on my head and neck, then stomped me again. C/O Millin then attempted to break my ankle at which time I kicked until he released my ankle then I was lifted from the ground and dragged off the tier.

> I received a spinal cord injury from the assault and they refused to act or investigate even though I complained about these officers prior to the incident and presented numerous witnesses.

*Id.* at 5-6.

Defendants' account of the September 15, 2015 incident differs from Plaintiff's account. They allege that Defendants Davis and Guyer were conducting rounds and noticed that the window to Plaintiff's cell was covered by a mattress. ECF Nos. 11-3, 11-4, 11-11 at 35, 37. After Plaintiff was unresponsive to orders that he move the mattress from its position blocking

the cell window, the officers opened the cell door. ECF Nos. 11-3, 11-4, 11-11 at 35, 37. According to Defendants, "at that point the mattress came flying out of the cell with inmate Stokes charging out of the cell behind it." ECF No. 11-11 at 35. Plaintiff hit Davis in the face, prompting Davis to strike Plaintiff in self-defense before Guyer and Davis forced Plaintiff to the ground. ECF Nos. 11-3, 11-4, 11-11 at 35, 37. Plaintiff continued to resist Guyer and Davis's efforts to subdue him until they were able to force Plaintiff's hands behind his back and apply handcuffs. ECF Nos. 11-3, 11-4, 11-11 at 35, 37. Officer Millin avers that he arrived when Davis and Guyer were applying the handcuffs, helped Plaintiff to his feet, and "immediately escorted [him] to the dispensary for medical treatment." ECF No. 11-5. Officer Bollard and Sergeant Sadler submitted affidavits stating that they were in the Control Center at the time of the incident and were not involved. ECF Nos. 11-6, 11-7.

Following the incident, but no later than October 21, 2015, Plaintiff was transferred at his request to Maryland Correctional Institution—Hagerstown, where he remains. *See* ECF No. 11-11 at 16.

**B. Administrative Proceedings**

1. Disciplinary Proceedings

On the day of the incident, Plaintiff was issued a disciplinary ticket for assaulting a staff member, and the correctional facility contacted the Department Public Safety and Correctional Services' ("DPSCS") Internal Investigative Division ("IID") to conduct an investigation into the altercation between Plaintiff and the officers. ECF No. 11-9 at 17, 21-23. Although Plaintiff refused to make a statement to the investigator on the date of the incident, he made a statement the following day in which he asserted, consistent with the above-noted summary of Plaintiff's

version of events, that Davis and four other officers initiated the assault. ECF No. 11-9 at 28-30, 40. Among other actions, the investigator attempted to take written statements from five inmates located in cells near Plaintiff's cell; only one inmate acknowledged seeing something, and his statement that "I didnt [sic] see anything the only thing I saw was him on the floor thats it and thats all [sic]" is consistent with both parties' versions of events. ECF No. 11-9 at 45; *see also* ECF No. 11-9 at 41-44 (statements of other four inmates; two claimed that they saw nothing, one wrote "N/A," and one wrote "RESIST"). Ultimately, in a report dated September 23, 2015, the IID investigator concurred with the officers' version of events that Plaintiff assaulted Davis by punching him in the face, prompting Davis to strike Plaintiff in self-defense and Davis and Guyer to force Plaintiff to the ground. ECF No. 11-9 at 6.

The hearing for Plaintiff's disciplinary ticket was held on October 2, 2015. The hearing officer found Plaintiff guilty, concluding that Davis and Guyer's statements were credible and that Plaintiff's statement was not credible or consistent with the photographs of him taken immediately after the incident. ECF No. 11-13 at 25-26. On the day of the hearing, Plaintiff appealed the decision to the Warden. ECF No. 11-13 at 11-14.[1] On October 14, 2015, the Warden affirmed the hearing officer's decision. ECF No. 11-13 at 15-16.

On November 4, 2015, Plaintiff appealed the Warden's decision to the Inmate Grievance Office ("IGO"). ECF No. 11-13 at 3-8. The IGO informed Plaintiff that he needed to provide evidence that he had exhausted his administrative remedies by first appealing the guilty finding to the Warden, and Plaintiff did so. ECF No. 11-13 at 9-14. On October 24, 2016, the IGO finally dismissed Plaintiff's appeal of the disciplinary hearing on the ground that Plaintiff was

_____

[1] At some point after the hearing but before October 21, 2015, Plaintiff was transferred, upon his request, to Maryland Correctional Institution—Hagerstown. *See* ECF No. 11-11 at 16.

only challenging factual and credibility determinations, which are within the purview of the hearing officer.  ECF No. 11-13 at 34.

     2. <u>Administrative Proceedings</u>

     During the same time period in which the disciplinary proceedings were being resolved, Plaintiff filed several grievances with prison officials pertaining to the September 15, 2015, altercation.  On October 12, 2015, while Plaintiff's appeal of the disciplinary hearing result was pending with the Warden, Plaintiff submitted a written complaint to DPSCS presenting his version of the incident (i.e., that the officers initiated the assault and that five officers were involved), asserting that he was framed by the officers, and requesting an investigation.  ECF No. 11-11 at 4-7.  Plaintiff also submitted the unsworn written statements of five inmates[2] consistent with Plaintiff's version of events and contrary to the officers' version of events.  ECF No. 11-11 at 8-12.  Specifically, the written statements collectively reported that four or five officers entered Plaintiff's cell;[3] while the officers were in Plaintiff's cell, the other inmates heard loud noises (described as "thumping and slamming," "bumping and banging" or "rumbling and banging") and Plaintiff's repeated protestations to the officers that he was not resisting; and the officers then threw Plaintiff out of the cell where he landed face-first on the ground, where they kicked him and one officer pinned him to the ground by placing a foot or a knee on the back of Plaintiff's neck.  ECF No. 11-11 at 8-12.

---

[2] Of the five, only one inmate (Phillip Woods) was among those inmates who were asked for a written statement as part of the IID investigation.  ECF No. 11-9 at 41-46; ECF No. 11-11 at 8-12.  The only thing that Woods wrote on his IID statement was "RESIST."

[3] This is contrary to Defendants' version of events that only two officers were initially involved with a third arriving on the scene after Plaintiff had been handcuffed, and that the altercation started after Plaintiff ran out of his cell behind a mattress.

Before a response to the Plaintiff's complaint was prepared, Captain W. Crist prepared an

internal memorandum stating, among other details:

> On October 19, 2015, I contacted Detective Mark Forest of IID and requested the name of the detective assigned to IID Case #15-35-0181 I/C. He informed me that Detective Christopher Burton had been assigned this case. I spoke with Detective Burton and was informed that he had closed the case. Det. Burton informed me that during his interview with Inmate Stokes he was made aware of the allegation of staff assault and was also given the inmate witnesses name[d] by Inmate Stokes. I asked Det. Burton i[f] another IID Case number was assigned because of the alleged staff assault and he stated it was all combined under the original case number. Det. Burton found no merit to Inmate Stokes' complaint and the case was closed.

ECF No. 11-11 at 2. Miller then responded to Plaintiff's complaint, substantially echoing Crist's

memorandum and stating,

> On September 16, 2015, Lt. Bingaman again interviewed you because you were alleging that officers had physically assaulted you. You did submit a written statement along with the names of inmate witnesses. This statement and names of witnesses were included with the UOF packet #15-026.
>
> On October 19, 2015, Captain Crist contacted Det. Burton and was told that they found no merit to your complaint and the case was closed.

ECF No. 11-11 at 1. It does not appear from the record that prison officials took any further

action in response to Plaintiff's October 12, 2015, submission.

In December 2015, Plaintiff filed several administrative grievances about his back pain

that referenced the September 15, 2015, assault by the correctional officers. ECF No. 1-1 at 1.

The first grievance was procedurally dismissed because the matter was being investigated by the

IID,[4] ECF No. 1-1 at 1-2, and later grievances were dismissed as being duplicative of the first

dismissed grievance, ECF No. 1-1 at 3-5. As previously noted, the IID investigation found no

---

[4] At the time that the grievance was dismissed on the ground that "[t]his issue is being investigated by IID, Case Number 15-35-01281," ECF No. 1-1 at 1-2, the referenced IID investigation had been concluded for nearly three months. *See* ECF No. 11-9 at 7 (reporting case closed on September 23, 2015).

merit to Plaintiff's complaint and noted that Plaintiff initiated the September 15, 2015, incident by striking Defendant Davis in the face. *Id.* at 17.

## II. APPLICABLE LEGAL STANDARDS

Defendants' motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004,

2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. Because Defendants have filed and relied on declarations and exhibits attached to their dispositive motion, their motion shall be treated as one for summary judgment.

Summary judgment is governed by Rule 56(a), which provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Because Plaintiff is proceeding pro se, his submissions are liberally construed. *See Erickson*, 551 U.S. at 94 (2007). Nonetheless, the Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

# III. DISCUSSION

## A. Exhaustion

Defendants raise the affirmative defense that Plaintiff has failed to exhaust his administrative remedies. If Plaintiff's claim has not been properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. The PLRA provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining"[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219. It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief").

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548

U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). But, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Blake*, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." 136 S. Ct. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d at 725 (4th Cir. 2008).

The Supreme Court stated in *Blake* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is

also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Blake* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

The DPSCS has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S.") §§ 10-201 *et seq*.; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a

13

condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; OPS.185.0002.02.[5]

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office IGO against any DOC official or employee. C.S. § 10-206(b). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02. There is an established administrative remedy procedure process that applies to all Maryland prisons. OPS.185.0002.02. Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official," OPS.185.0002.05C(1), which is defined by C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." In the DOC, each facility's warden is responsible for the ARP at the institutional level. OPS.185.0002.05E. Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. OPS.185.0002.05J.

---

[5] OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive") available for review at http://itcd.dpscs.state.md.us/PIA. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see also* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP. The prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee. OPS.185.0002.05L. For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. *Id.*

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code Ann., State Gov't §§ 10-101 et seq.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A. However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g.*, *Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The ARP process applies to the majority of inmate complaints. However, it does not apply to case management decisions, which are to be directly grieved to the IGO. OPS.185.0002.05F(1). Nor does it apply to Maryland Parole Commission procedures, decisions to withhold mail, or Prison Rape Elimination Act related claims. OPS.185.0002.05F(2),(4),(5). Those categories of complaints are addressed through separate administrative processes. *Id*.

Finally, the ARP process does not apply to complaints relating to prisoner disciplinary procedures and decisions. OPS.185.0002.05C(3). If a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's guilty decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.02.27.33(A)(1),(2). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, he or she is considered to have waived the right to appeal. *Id.*, COMAR 12.02.27.33(A)(3). If the warden affirms the hearing officer's guilty finding or sanction, the prisoner may then appeal to the IGO. COMAR 12.02.27.33(D); *see also* COMAR 12.07.01.05 and .06C. When filing this appeal with the IGO, the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

While a prisoner may pursue the ARP process to allege that correctional officers used excessive force, such ARPs may be procedurally dismissed if the IID has decided to conduct an investigation into the use of force incident at issue in the ARP. OPS.185.0002.05.E(6) & K(3)(e). If this procedural dismissal indicates that no further action may be taken through the ARP process, a prisoner ostensibly could file a grievance directly with the IGO, as there would be no further administrative remedies available through the ARP process.

The Defendants argue that Plaintiff failed to exhaust his administrative remedies because he did not appeal the Warden's procedural dismissal of his ARP grievances to the IGO.[6] ECF No. 11-1 at 10-15. Despite the fact that "[a] managing official may procedurally dismiss an ARP request that addresses an issue under investigation by the Department's Internal Investigative Division," thereby providing the inmate with no merits-based institutional review, the Defendants insist that inmates can still seek and obtain administrative review through the IGO. ECF No. 11-1 at 7-8. As evidence of this assertion, they note that

> At least three examples where inmates received an Inmate Grievance Office hearing notwithstanding an IIU[7] investigation are contained in the United States District Court for the District of Maryland records. *See*, *Dunn v. Parsons*, No. 8:11-cv-01960, Dkt. No. 24-17, Ex. 13 (Nov. 11, 2011); *Diggs v. Balogan*, 8:15-cv-00535, Dkt. No. 1 (D. Md. Feb. 24, 2015); *Brightwell v. Hershberger*, 11-cv-3278, Dkt. No. 141-2, Ex. 3 & 4. These examples demonstrate that meaningful administrative remedies were available and could be successfully pursued under prison directives.

---

[6] The Court notes that it is clear that Plaintiff exhausted his administrative remedies as to the disciplinary hearing, which arose out of the September 15 altercation. Indeed, at every stage of the administrative proceedings surrounding the disciplinary hearing, Plaintiff asserted—as he does in the instant case—that the Defendants initiated the assault on him. ECF No. 11-13 at 4-7 (making this claim in appeal to IGO), 12-14 (making this claim in appeal to Warden), 24-25 (making this claim at disciplinary hearing).

[7] IIU stands for Internal Investigative Unit, a label which appears interchangeable with IID. For consistency, this memorandum uses IID, except when quoting from sources using IIU.

ECF No. 11-1 at 8. Although the Defendants acknowledge the *Blake* grounds for finding an administrative remedy unavailable, they contend that none of these grounds are applicable to the instant case. ECF No. 11-1 at 14.

In response to the Defendants' exhaustion argument, Plaintiff notes that their Motion "neglect[s] to mention Plaintiff's ARP was turned into an IID investigation and despite numerous complaints Plaintiff has yet to receive a decision or response to appeal to date 16 months later." ECF No. 17 at 5. Further, demonstrating the Defendants' alleged failure to provide a decision on the IID investigation after indicating that his ARP grievance was converted into such an investigation, Plaintiff argues:

> when an inmate fails to receive a response to or decision on his grievances, the administrative appeals process is unavailable to him and the prisoner is therefore deemed to have exhausted his appeals. Also there is documented evidence of defendants denying [sic] to give Plaintiff ARPs or destroying them altogether. The defendants blocked the plaintiff's avenue to exhaust[.]

ECF No. 17 at 6.

Based on the parties' arguments, it is undisputed that Plaintiff did not exhaust all administrative remedy procedures. This failure, however, does not necessarily defeat his claim. Instead, the relevant issue is whether any of the *Blake* grounds apply such that some steps in the administrative process were unavailable to Plaintiff. The Court concludes that the third *Blake* ground—exhaustion thwarted by misrepresentation—is applicable to Plaintiff's excessive force claim.

In response to Plaintiff's initial ARP regarding the September 15, 2015 assault, prison officials advised that the ARP would be dismissed because an IID investigation was underway. ECF No. 1-1 at 1. Thereafter, Plaintiff's ARPs regarding the September 15, 2015, assault were

simply dismissed as repetitive to the initial ARP. *See* ECF No. 1-1 at 3-5. Plaintiff clearly understood the denials to mean that an investigation had been opened in response to his ARP, thereby terminating any administrative process. *See* ECF No. 1 at 3 (noting in his Complaint that his administrative grievance "was withdrawn and turned over for an IID investigation that didnt [sic] occur" and that "[t]here is no procedure to appeal" a decision to convert an ARP grievance into an IID investigation). Plaintiff's understanding was wholly reasonable, particularly in view of the language of the ARP dismissal that "[t]his issue *is being* investigated by IID, Case Number 15-35-01281." ECF No. 1-1 at 1 (emphasis added).

Further demonstrating the thwarting of Plaintiff's use of the administrative process is the undisputed fact that, at the time Plaintiff's ARPs were dismissed, the IID investigation was not ongoing as represented by Defendants but had actually been closed for nearly three months. Thus, although Plaintiff did not exhaust all procedures for administrative exhaustion, some procedures were unavailable to him due to the Defendants' misrepresentation that an IID investigation into his allegations was underway. ECF No. 11-9 at 6-7. Prison officials misrepresented the status of the investigation, causing Plaintiff to incorrectly believe that his grievance about the assault was being evaluated. Thus, as to Plaintiff's excessive force claim, the Court concludes that Plaintiff exhausted all *available* remedies and rejects Defendants' argument that the action should be dismissed for failure to exhaust.

As to the failure to protect claim, it does not appear that Plaintiff exhausted his available administrative remedies. In the ARP grievances prompting the misleading response that an IID investigation was underway, Plaintiff did not specifically discuss the failure of Miller, Appel, or others to act on his complaints before the September 15, 2015, assault. *See* ECF No. 1-1. Thus,

dismissal of this claim for failure to exhaust appears appropriate. However, given the questionable argument for exhaustion generally and the fact that the Defendants' exhaustion argument failed to distinguish between the excessive force and the failure to protect claims, the Court will alternatively consider the merits of this claim.

**B. Failure to Protect: Defendants Miller and Appel**

Plaintiff alleges that Miller and Appel failed to protect him from the September 15 assault. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Punishments implicating the Eighth Amendment are not limited to the sentences actually handed down by the sentencing court but may also include deprivations suffered by inmates during imprisonment." *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017) (alterations and internal quotation marks omitted).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials," such as taking "reasonable measures to guarantee the safety of the inmates" from physical assault. *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (internal quotation marks omitted). "However, not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* (internal quotation marks omitted). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury, or a substantial risk thereof." *Id.* (internal quotation marks omitted). The objective inquiry requires this Court to "assess whether society

considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and that the inference was drawn. *Id.* at 837. Further, "the prison official must *consciously disregard* that known risk of serious harm." *Anderson*, 877 F.3d at 544 (internal quotation marks omitted). Thus, where a prison official has knowledge of the risk and reasonably responds to the risk, the official has not disregarded the risk and therefore has not violated the prisoner's Eighth Amendment rights, even if some harm does ultimately result. *Farmer*, 511 U.S. at 844-45. A plaintiff may "prove an official's actual knowledge of a substantial risk in the usual ways including inference from circumstantial evidence" so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128 (internal quotation marks omitted).

As discussed more fully in the next section, Plaintiff alleges that five corrections officers assaulted him without provocation causing him to suffer injuries including damage to his spine. Because this certainly amounts to a claim of serious or significant physical injury, Plaintiff can overcome a summary judgment motion as to the objective element of a failure to protect claim.

Turning to the subjective element, Plaintiff asserts that prison administrators "refused to act or investigate even though [he] complained about these officers prior to the incident." ECF No. 1 at 6. If this assertion was supported by evidence, it would likely survive summary judgment. However, both the Defendants' exhibits and Plaintiff's own statements contradict this claim. For example, Plaintiff claims that he "complained to the Warden, Chief of Security and Central Office" over a period of several months that corrections officers were feeding information to other inmates, and those inmates were harassing him. ECF No. 1 at 5. The evidence establishes that administrators undertook some investigation in response. As a September 4, 2015, letter to Plaintiff from Miller states,

> [Y]ou stated that staff, correctional officers at RCI, is leaking information that could lead to your death. Additionally you stated that you have written sixteen times to the Warden's Office concerning your personal safety. According to the inmate correspondence log in the Warden's Office you have written 9 letters to this office over the past year. [In t]he letter written to Warden Stouffer in February of 2015 you referenced fearing for your personal safety. The matter was investigated by Investigative Captain Crist and was found to be unsubstantiated. On August 27, 2015, you were interviewed by Investigative Lieutenant Cutter, and Intelligence Lieutenant Appel concerning the leaked information and those who had leaked information concerning you, endangering your personal safety. During the interview you did not provide any information to assist in determining what information concerning you had been leaked or those who leaked the information. Additionally there was not [sic] information provided that would assist in determining the source of your endangerment.

ECF No. 11-10 at 1. Plaintiff does not dispute that these investigations occurred. In fact, his Complaint acknowledged the August 27, 2015, interview with Appel and conceded that he "withheld names [of the officers and inmates involved] for my own safety." ECF No. 1 at 5.

Further contradicting Plaintiff's unsupported assertion that he "complained about these officers"—meaning Defendants Davis, Guyer, Bolland, Millin, and Sadler—prior to the September 15, 2015, assault, ECF No. 1 at 6, Plaintiff stated after the assault that four different

officers, none of whom was named as a Defendant in the instant case, were the officers responsible for placing Plaintiff in danger by spreading rumors about him to gang-affiliated inmates. ECF No. 11-11 at 5 ("Since my arrival here Officers Price, c/o Hague, Smith, and Thomas have been spreading my information and rumors to gang members . . . placing my life in danger."). Thus, even if Plaintiff had actually informed Appel and Miller of the names of the officers placing him in danger, an assault by five different officers would not be foreseeable.

Finally, Plaintiff's complaints to prison administration focused on the fact that the officers purportedly told other inmates information about him, prompting those inmates to harass him. *See* ECF No. 1 at 5 ("[B]y November 2014 I had c/o's feeding the gangs information which led to my being extorted assaulted and harassed. I complained to the Warden, Chief of Security and Central Office for 8 months[.]"). It does not reasonably follow from this allegation that Plaintiff would be in danger of physical assault by officers. Assuming that such a complaint was credible, a responding prison administrator would likely be expected to ensure that Plaintiff was kept away from the threatening inmates, but would not anticipate that Plaintiff be kept away from particular officers. As Miller's September 4, 2015, letter to Plaintiff states, "I am aware that you are currently assigned to Administrative Segregation . . . . The security practices of Administrative Segregation are sufficiently executed to ensure your continued safety while at RCI," indicating that Miller considered Plaintiff's fears of assault by other inmates but determined that Plaintiff's placement at the time—being housed in segregation and without a cellmate—was adequate to protect him from such an assault. ECF No. 11-10 at 2; *see also* ECF No. 1 at 5 (Plaintiff's acknowledgment that he had no cellmate at the time of the assault).

In sum, Plaintiff cannot demonstrate that Miller or Appel subjectively knew of and disregarded the risk that the other five Defendants would physically assault him. Plaintiff's complaints did not alert administrators that he faced a risk of injury at the hands of prison guards, only that prison guards were apparently leaking information about him to inmates, thereby placing him at risk of assault by those inmates. Further, prison administrators did investigate Plaintiff's complaints; however, Plaintiff did not provide the names of the officers who were feeding information to fellow inmates. "Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer* 511 U.S. at 844. Based on Plaintiff's complaints regarding fears of inmate assault, Miller made a reasonable determination that Plaintiff was safe from the complained-of harm in his single-cell placement in Administrative Segregation. Accordingly, even if not subject to dismissal on exhaustion grounds, Plaintiff's failure-to-protect claim against Miller and Appel fails on the merits.

**C. Excessive Force: Defendants Davis, Guyer, Bolland, Millin, and Sadler**

Plaintiff alleges that Davis, Guyer, Bollard, Millin, and Sadler used excessive force by assaulting him on September 15, 2015. A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986). The Eighth Amendment prohibits prison officials from using force unnecessarily and wantonly to inflict pain on prisoners. *Id.* at 319. When considering a prisoner's Eighth Amendment claim, a court must consider 1) the objective nature of the force used and the resulting harm and 2) the subjective intent of the officers. *See Hudson v. McMillian*, 503 U.S. 1, 8, (1992). The objective component

of the inquiry is "contextual and responsive to 'contemporary standards of decency.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). However, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9. Thus, the crucial question is whether the force applied by the prison officials was "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6–7.

To make this determination, a court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321. The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, then liability is not avoided "merely because [the prisoner] has the good fortune to escape without serious harm." *Id.* at 38.

The allegations of the Complaint are sufficient to state a claim that the force the Officers used against Plaintiff was excessive. The picture painted by the Complaint is one in which the Officers launched an unprovoked attack against a compliant, nonviolent inmate that continued even after the inmate was handcuffed. ECF No. 1 at 5-6.

The Defendants dispute Plaintiff's version of events and have filed affidavits stating that Plaintiff initiated the altercation by running out of his cell behind a mattress and striking Defendant Davis. *See* ECF Nos. 11-3, 11-4, 11-5, 11-6, 11-7. However, the record contains

25

sufficient evidence to create a factual dispute over the events. Plaintiff's Response to the Motion for Summary Judgment notes that he has five witnesses to support his version of events. ECF No. 17 at 3. Although such an assertion, without supporting documentation, would normally be inadequate to defeat a summary judgment motion, the Defendants' exhibits establish that these statements exist.[8] ECF No. 11-11 at 8-12. One statement was made under penalty of perjury, ECF No. 11-11 at 11, and another starts with the declarant stating that he "hereby tell[s] the truth the [w]hole truth," ECF No. 11-11 at 8. As detailed in the facts section, these five statements contradict the Defendants' affidavits, and support the Plaintiff's version of events, including the fact that the Defendants physically assaulted him after Plaintiff was in handcuffs and lying on his stomach on the ground. ECF No. 11-11 at 8-12. As there are factual disputes over what occurred on September 15, 2015, Defendants Davis, Guyer, Bolland, Millin, and Sadler are not entitled to Summary Judgment.

**D. Qualified Immunity**

Defendants also argue that they are entitled to summary judgment based on qualified immunity. ECF No. 11-1 at 21-22. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[Q]ualified immunity protects law officers from bad guesses in gray areas and it ensures that they may be held personally liable only for transgressing bright lines." *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (internal quotation marks omitted). Qualified immunity is a defense from suit, not simply liability, which

---

[8] Although Plaintiff did not submit the relevant statements to this Court, Plaintiff (via a fax from his mother) provided the statements to the Warden initially. ECF No. 11-11 at 4.

is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007).

Having concluded that the claims against Defendants Miller and Appel must be dismissed, the qualified immunity analysis is necessary only as to the claim against Defendants Davis, Guyer, Bolland, Millin, and Sadler. Construed in the light most favorable to Plaintiff, the conduct at issue is an unprovoked assault by five officers on a compliant, nonviolent inmate that continued even after the Plaintiff was in handcuffs.[9] Unquestionably, it is well established that

---

[9] Obviously, the Defendants dispute the facts underpinning Plaintiff's claim of unprovoked assault, and they argue that Plaintiff initiated the attack prompting their use of reasonable force to gain control over him. However, as noted, the qualified immunity analysis considers the facts in the light most favorable to the Plaintiff. *Saucier*, 533 U.S. at 201.

such an unprovoked assault violates the Eighth Amendment. Therefore, the Court concludes that Davis, Guyer, Bolland, Millin, and Sadler are not entitled to qualified immunity.

## CONCLUSION

Accordingly, the Court construes the Defendants' Motion as a Motion for Summary Judgment. The Court GRANTS the Motion as to Defendants Miller and Appel, and DENIES the Motion as to the remaining Defendants. Finally, the Court GRANTS Plaintiff's Motion to Appoint Counsel. ECF No. 16.

A separate order follows.

Dated this 31st day of January, 2018 .

FOR THE COURT:

_____/s/_____

James K. Bredar
Chief Judge